UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

ELIZABETH J. STALLMAN,

         Debtor.

_____/

Case No. DT 15-04700
Hon. Scott W. Dales
Chapter 7

ROSEMARY McNally and JEFFREY
DIETEL,

         Plaintiffs,

v.

ELIZABETH J. STALLMAN,

         Defendant.

_____/

Adversary Pro. No.  16-80011

MEMORANDUM OF DECISION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
                  Chief United States Bankruptcy Judge

I.  INTRODUCTION

This matter is before the court on a second set of summary judgment motions filed several months after the court denied the first set of such motions and directed defendant Elizabeth Stallman to sit for a deposition. The court held oral argument to consider the motions on July 16, 2018, in Traverse City, Michigan, and took the matters under advisement. After reviewing the parties' submissions and the transcript of their recent argument, the court will deny the Plaintiffs' motion, and grant the Defendant's motion in part.

The general background of this dispute is well-known to the litigants, and largely set forth in the court's Memorandum of Decision and Order entered on October 25, 2017

(ECF No. 61, the "First MDO").[1]  In a nutshell, Rosemary McNally and Jeffrey Dietel (the "Plaintiffs") contracted with non-party Stallman Builders to build a home on Lake Leelanau.  Stallman Builders was a Traverse City construction company from which defendant-debtor Elizabeth Stallman and her former husband (Charles) earned a living before local law enforcement authorities prosecuted and convicted Charles for violating the Michigan Building Contract Fund Act ("MBCFA").[2]  Because a local prosecutor is considering whether to prosecute Ms. Stallman under the MBCFA, she has asserted her Fifth Amendment privilege against self-incrimination in response to numerous, though not all, questions the Plaintiffs posed during her recent court-ordered deposition in this matter.

Although the Plaintiffs sued Ms. Stallman, her husband, and Stallman Builders in state court before Ms. Stallman filed her bankruptcy petition, the automatic stay in Ms. Stallman's bankruptcy case prevented them from liquidating or even establishing their claim against her.  So, within the time allowed, they filed a two-count complaint in this court to establish a claim against her and to except that claim from discharge under 11 U.S.C. § 523(a)(2) and (a)(4).

Discovery is now concluded and each party again seeks summary judgment under Fed. R. Civ. P. 56, applicable in this proceeding under Fed. R. Bankr. P. 7056.

---

[1] The court has previously expressed its conclusion that it has (i) jurisdiction over this controversy and (ii) authority to enter a final order resolving it.  Today's order, however, is not final.  *See* First MDO at p. 2; Fed. R. Civ. P. 54.

[2] The MBCFA is a penal statute from which Michigan courts have inferred a civil action for breach of the statutory trust the statute imposes on contractors such as Charles and, depending on the outcome of this adversary proceeding, Elizabeth Stallman.  *DiPonio Const. Co. v. Rosati Masonry Co.*, 246 Mich. App. 43, 48, 631 N.W.2d 59, 62 (2001) (noting that Michigan has long implied a civil cause of action).

## II.  PLAINTIFFS' SUMMARY JUDGMENT MOTION

It is not unfair to say that Plaintiffs' theories in this case have shifted somewhat, and indeed they continue to sway.  For example, their count under § 523(a)(2) vacillates between a "fraud in the inducement" and "Ponzi scheme" theory.  Defendant's counsel has understandably expressed frustration that, at this late stage in the proceeding -- following the close of discovery -- their fraud theory remains in flux.  Indeed, counsel points to the absence of any evidence linking Ms. Stallman to the Stallman Builders's bid at the heart of the fraudulent inducement theory as a reason to dismiss the fraud-based count.

Indeed, the Plaintiffs appear to be distancing themselves from a theory based on Ms. Stallman's actual or express misrepresentation, and now seem to gravitate towards a Ponzi-scheme-theory, suggesting in their papers and at oral argument that Ms. Stallman knew Stallman Builders was a sinking ship and, pirate-like, she collaborated with her estranged husband to deceitfully conscript new customers, including the Plaintiffs, to keep the ship afloat.  Perhaps their amorphous theories will continue to take shape, but as the court observed at the hearing, after *Husky Int'l Electronics v. Ritz*, 136 S. Ct. 1581 (2016), there can be no doubt that debts arising from fraudulent schemes may be excepted from discharge under § 523(a)(2) even without express misrepresentations.  The question, of course, is whether Ms. Stallman participated in such a fraudulent scheme in a manner that exposed her to liability to the Plaintiffs and a declaration from the court excepting the debt from discharge under § 523(a)(2)(A).[3]

---

[3] At trial the court may be required to consider whether or to what extent Plaintiffs' theory comes within § 523(a)(2)(B) as involving misrepresentations regarding the financial condition of Stallman Builders, whether the company is an "insider" within the meaning of § 101(31), and whether the claim is supported by written statements.

With respect to the Plaintiffs' theory of defalcation by a fiduciary under § 523(a)(4), in resolving the first set of summary judgment motions the court pared that count considerably by determining that, although Ms. Stallman may not technically have "accounted for" the $292,119.87 comprising the statutory trust fund, the Plaintiffs nevertheless have no claim for the return of that "*res*" because they received equivalent value when Ms. Stallman persuaded lienholders (who had improved the Plaintiffs' property) to release their liens sometime in May 2015.  In other words, assuming Ms. Stallman is a fiduciary under the MBCFA, and although she may have knowingly defaulted in meeting her obligations as a fiduciary, the Plaintiffs no longer have any claim for the return of the trust fund.  As the court observed in the First MDO and during the hearing on the second round of motions, however, the Plaintiffs may have damage claims resulting from the breach.  *See, e.g.*, First MDO at p. 5 ("So, in the present case, if the Plaintiffs can prove that Ms. Stallman qualifies as a fiduciary, and that some liability on account of the defalcation remains unpaid -- *i.e.*, something beyond the trust *res* for which she has already accounted -- they may be able to establish the existence of a debt that is excepted from discharge under § 523(a)(4)"); *see also* Transcript of hearing held in Traverse City, Michigan, on July 16, 2018 (ECF No. 86, the "Tr.") at p. 55 (articulating theory of claim for breach of fiduciary duty beyond return of the statutory *res*).

In response to the first round of summary judgment motions, the court was unable to determine whether Ms. Stallman was acting as a fiduciary under the MBCFA; whether she breached any duty to the Plaintiffs on account of their specific project (the construction of their lake house); whether the Defendant could be found to have committed fraud in the inducement for the allegedly false quote;  or whether she is otherwise liable for her fraud

in performing the contract or as a result of forged documents.  In response to the second round of summary judgment motions, the court is not much closer to resolving the dispute without a trial.

In arriving at today's ruling, the court has declined to draw the negative inferences stemming from Ms. Stallman's invocation of her Fifth Amendment privilege that the Plaintiffs urged it to draw in support of their motion.  First, the court acknowledges binding authority from within our circuit that will preclude Ms. Stallman from offering trial testimony to answer questions which she declined to answer during her deposition.  *See Traficant v. Comm'r of I.R.S.*, 884 F.2d 258, 265 (6th Cir. 1989); *General Motors v. Heraud (In re Heraud)*, 410 B.R. 569, 575-76 (Bankr. E.D. Mich. 2009).  These authorities, and the court's decision to follow them, however, will not establish any fact by negative inference or otherwise, but instead will only preclude Ms. Stallman from making a factual showing to the extent of her earlier refusal to testify.  In other words, her failure to answer questions at the deposition does not warrant an order akin to the sanctions permitted under Fed. R. Civ. P. 37(b)(2)(A)(i).[4]

Second, the court acknowledges the authorities that Plaintiffs' counsel cogently compiled in her brief and described during the hearing, including *Heraud*, in which several lower courts within our circuit (and elsewhere) either expressed a willingness to draw negative inferences in the summary judgment setting after the assertion of the Fifth Amendment privilege, or actually drew them (usually to fortify other evidence on the particular points).  *See Flagg v. Detroit*, 715 F.3d 165 (6th Cir. 2013); *Braswell v.*

---

[4] The court's order compelling Ms. Stallman to sit for her deposition despite her apprehension about criminal prosecution (ECF No. 61) specifically contemplated that she might assert her constitutional privilege, so when she asserted this right, she did not disobey the court's order.

*McCamman*, 256 F.Supp.3d 719 (W.D. Mich. 2017); *RBS Citizen v. M-59 Telegraph Petroleum, LLC,* 2013 WL 4496248, slip op. no. 2:12–CV–11193 (E.D. Mich. Aug. 21, 2013); *United States Security and Exchange Commission v. Zada*, 2013 WL 3945993, slip op. no. 10-CV-14498 (E.D. Mich. July 31, 2013); *Wuliger v. Kelco, Inc.,* 2006 WL 51126, slip op. no. 3:02-CV-1348 (N.D. Ohio Jan. 10, 2006); *Youngstown Osteopathic Hospital Association v. Pathways Center for Geriatric Psychiatry, Inc.,* 280 B.R. 400 (Bankr. N.D. Ohio 2002); *see also* Tr. at pp. 5, line 22 *et seq*.  In several of these cases, as counsel acknowledged during the argument, courts used the negative inferences to supplement record evidence that, arguably, sufficed without the inference to support the court's decision.  The courts' statements about negative inferences in these cases are probably best understood as *dicta*.

In any event, as Plaintiffs' counsel concedes, the court has the discretion to draw negative inferences but is not required to do so.  *See* Tr. at p. 12, lines 14-16.  Given the long-standing summary judgment practice forbidding the court from drawing inferences in favor of the moving party and the relative weakness of the Plaintiffs' case without the inferences, the court declines to draw them at this point in the proceeding.  *See Baxter v. Palmigiano*, 425 U.S. 308 (1976).

Moreover, the court agrees with Ms. Stallman's counsel that the open-ended nature of most questions the Plaintiffs put to Ms. Stallman at her deposition, and the mode of interrogation generally do not warrant any adverse inferences.  The court must be careful not to unduly burden Ms. Stallman's assertion of her constitutional right against compelled self-incrimination and agrees that counsel's failure to present her with evidence in connection with those depositions questions -- evidence which would naturally excite a

denial -- makes the drawing of any inference untenable. The premise of the Supreme Court's decision in *Baxter*, *supra*, is the common-sense belief that a person who is confronted with specific inculpatory evidence would deny the evidence or at least offer a contrary explanation. In the absence of such denial or explanation when *so confronted with evidence,* a court may assume the truth of the evidence presented. Reviewing the transcript of the deposition, the court concludes that Plaintiffs' counsel did not present the inculpatory evidence to Ms. Stallman in a manner that would naturally have drawn a denial. Instead, counsel offered broad statements, generally of law, untethered to record evidence. There is no basis for drawing the negative inference under the circumstances, even if the court were inclined to do so in the summary judgment setting (which it is not).

For the foregoing reasons, the court will deny the Plaintiffs' renewed motion for summary judgment.

### III.  DEFENDANT'S SUMMARY JUDGMENT MOTION

With respect to Ms. Stallman's arguments, the court is also not prepared to dispose of the entire case in response to her second motion, although it will limit the Plaintiffs' damage claim to a considerable extent. In her motion, Ms. Stallman seeks the following determinations:

4.  With respect to two fraud-based claims, the Court should dismiss them because Plaintiffs cannot establish that Libby Stallman made any material representations to them.

5.  To the extent that Plaintiffs are trying to hold Libby Stallman liable for any fraud-based claim against Stallman Builders, such attempts fails [sic] for the following independent reasons. First, Plaintiffs failed to bring these claims against Stallman Builders in state court litigation and are, therefore, barred from bringing them now. Second, both fraud-based claims against Stallman Builders are barred because they are contractual in nature.

6.      With respect to a breach of fiduciary duty by Defendant, Defendant respectfully renews its argument that she is not a fiduciary as a legal matter.

7.      Were the Court to disagree and adopt a functional approach to the definition of a fiduciary, there are disputed material facts that would preclude a decision on whether she was a fiduciary and whether she breached her duty to Plaintiffs. Nevertheless, a partial summary judgment is warranted to reduce the issues for trial and to, potentially, further close the gap between the parties.

8.      Accordingly, Libby Stallman respectfully request that the Court find that, assuming she is a fiduciary and assuming she breached her fiduciary duty, she is not liable for more than $4,176 (related to some travel expenses and some attorney fees).

*See* Defendant's Second Motion for Summary Judgment (ECF No. 65) at p. 2.

Addressing Ms. Stallman's arguments in the order presented, contrary to her contention, establishing a fraud debt under § 523(a)(2) does not require a misrepresentation, as the court noted above and during oral argument. *See Husky Int'l*, 136 S.Ct. at 1590. As the Supreme Court recently held, "[b]ecause we must give the phrase 'actual fraud' in § 523(a)(2)(A) the meaning it has long held, we interpret 'actual fraud' to encompass fraudulent conveyance schemes, even when those schemes do not involve a false representation." *Id.* Although the alleged scheme in the current case differs from the scheme in *Husky*, the court concludes (based on the broad interpretation of "actual fraud" included in *Husky*) that the Plaintiffs may prevail even if they cannot establish that Ms. Stallman made any false statement.

Although the Plaintiffs have not connected Ms. Stallman to the utterance of the allegedly false quote or deceptively low bid, her involvement in the financial affairs of Stallman Builders through the period in which the company bid and breached the contract with the Plaintiffs finds support in the record evidence. Consequently, Plaintiffs' showing precludes the court from absolving her from liability under either the fraud or fiduciary

theories that remain after entry of the First MDO.  Indeed, her role as bookkeeper and the person who cut most of the company's checks, including some in connection with the Plaintiffs' project, could permit a fact finder to conclude that she had pervasive involvement in the business that, as a functional matter and irrespective of any formal role as officer, would warrant a finding that she is a fiduciary under the MBCFA, or a fraudster under the common law.  Certainly, there are facts within the record pointing in the other direction -- *e.g.*, her estrangement from her husband who was the key player at Stallman Builders, and her relatively late involvement in the Plaintiffs' specific project -- but this only shows that summary judgment on liability is not warranted.  If, at trial, the Plaintiffs can show that Ms. Stallman conspired with her husband to defraud them through the instrument of Stallman Builders, and otherwise establish the elements of a fraud claim (including damages causally related to the fraud), the Plaintiffs might prevail on their apparently shifting theory under Count I of their complaint.

Similarly, the Supreme Court's opinion in *Brown v. Felsen,* 442 U.S. 127 (1979), disposes of the claim preclusion argument in the fifth quoted paragraph from Ms. Stallman's motion.  The Supreme Court squarely rejected the contention that creditors must assert fraud claims, prepetition, as a condition of later asserting rights under § 523(a)(2) when the defendant seeks bankruptcy protection.  The federal policies of preventing the unscrupulous from discharging fraud debts, and in having these issues resolved in bankruptcy court, override state pleading rules, such as those to which Ms. Stallman points in her brief.

As for Ms. Stallman's argument that the supposed fraud damages are barred by the "economic loss doctrine," or rather its common-law cousin in non-UCC cases, the *Hart*

doctrine named for *Hart v. Ludwig*, 347 Mich. 559, 79 N.W.2d 895 (1956), the court is not persuaded. These doctrines are designed to prevent litigants (and the courts) from interfering with the private allocation of risk inherent in any contract. As the Michigan Court of Appeals observed when refusing to hold that the economic loss doctrine barred all fraud claims:

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely -- which normally would constitute grounds for invoking the economic loss doctrine -- but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior.

*Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 372–73, 532 N.W.2d 541, 545 (Mich. App. 1995). Stated differently, there is a duty separate from a contract itself to refrain from making misrepresentations and engaging in deceitful conduct. Here, the Plaintiffs seem to be arguing that Ms. Stallman (and her non-party husband) duped them into dealing with Stallman Builders in a deceitful or fraudulent effort to prop up their failing business and extend for themselves the benefits of looting it for sailing lessons, school activities, repayment of inter-family debt, and other unjust enrichment at the Plaintiffs' expense. Moreover, the Plaintiffs did not have a contract with Ms. Stallman -- only Stallman Builders[5] -- and applying the economic loss or *Hart* doctrine to non-contracting actors is (i) not supported by the policy underlying the doctrine and (ii) an extension of Michigan law better left to the state courts. It is not uncommon for the unscrupulous to perpetuate fraudulent schemes through corporate instrumentalities and private, albeit corrupt, contracts, and the court is therefore reluctant to remove any arrows from the victims' quiver.

---

[5] *See* Tr. at p. 52, lines 20-25 (noting that Stallman Builders is the contracting entity).

In general, more modern courts should be less concerned about intellectual purity in damage theory (*i.e.*, keeping tort and contract damages in separate silos) and more concerned with providing sufficient, but not duplicate, recoveries for a single wrong. *See, generally, Grace v. Grace*, 253 Mich. App. 357, 655 N.W.2d 595 (Mich. App. 2002). Accordingly, the court will not apply the *Hart* doctrine to limit the Plaintiffs' damages in this case.

The law of the case doctrine disposes of the contention, in the sixth quoted paragraph, that Ms. Stallman is not a fiduciary as a matter of law.[6] The court rejected the argument in the First MDO, adopting a functional approach to the issue of whether she qualifies as a "contractor" under the MBCFA given her extensive check-writing authority, admissions in her divorce proceeding, and reasonable inferences the court must draw in favor of the Plaintiffs at this stage of the proceedings. Addressing the seventh paragraph in Ms. Stallman's motion, the court again finds a question of fact about whether she qualifies as a contractor (and therefore a fiduciary). This uncertainty precludes summary judgment.

The eighth paragraph of Ms. Stallman's motion, however, requires a more extended discussion, as it evidently seeks legal rulings limiting several categories of damages that the Plaintiffs have espoused in this case.

As the court suggested in its First MDO and its pre-hearing letter to the parties (ECF No. 84) the Plaintiffs have had difficulty linking their theories of claim to their

---

[6] *Pepper v. United States*, 562 U.S. 476, 506 (2011) (as a matter of discretion, when a court decides an issue in one stage of the case it should apply to the rest of the case absent unusual circumstances); *but see* Fed. R. Civ. P. 54.

damage claims and even during the hearing they seemed to acknowledge this difficulty. *See* Tr. at pp. 33-35.

Certainly, assuming the Plaintiffs prove their case at trial that Ms. Stallman is a "contractor" under the MBCFA, and that they have a claim against her for breach of fiduciary duty under the statute (beyond the return of the trust *res* already accounted for in the court's First MDO),[7] they may recover damages caused, actually and proximately, by the breach. Similarly, if they prove that she fraudulently obtained money from them by, in effect, conspiring with her husband to induce the Plaintiffs to deal with Stallman Builders, knowing that the company could not perform as promised, it is conceivable that they may prove damages on that score, as well, subject, of course, to the single-satisfaction principle underlying all damage calculations.

The second category of damages enumerated in Mr. Dietel's affidavit for "cost of correction and completion of project beyond the false quote" and architect fees, is quite likely less than the amounts requested. As the Plaintiffs' counsel conceded during the hearing, the Plaintiffs continue to own the lake house at the center of the controversy and may therefore in fairness be required to offset the value of the property against the damage claim to some extent.[8] Regardless of the seemingly shaky ground for this category of damages, however, the issue is one requiring proof at trial.

The court has already rejected the claim relating to the liens of Michigan Prestain, based on the preclusive effect of a prior state court ruling. This court's ruling based on that

---

[7] *See* Affidavit of Jeffrey Dietel dated March 30, 2018 (ECF No. 73, the "Dietel Aff.") at Exh. 2, par. 1 (referring to damages for funds "fraudulently converted" in the amount of $248,351.43).

[8] *See* Dietel Aff. at Exh. 2, par. 2-3; Tr. at p. 32, line 6 to p. 33 line 3.

court's ruling is law of the case, regardless of the Plaintiffs' stubborn persistence in asserting the argument after the court resolved it in the First MDO. *See, supra,* at n. 6.

Even Ms. Stallman concedes that some portion of the Plaintiffs' "other exemplary, consequential and incidental" damages may be compensable, assuming a finding of liability, although her assessment is a tiny fraction of the Plaintiffs' version.[9]  Moreover, although the American Rule may bar the Plaintiffs from recovering their attorneys fees in this adversary proceeding, Michigan recognizes an exception to the rule for fees and expenses incurred in separate proceedings, if caused by the proven harm. *State Farm Mut. Automobile Ins. Co. v. Allen*, 50 Mich.App. 71, 212 N.W.2d 821 (1973) (reasonable attorney fees incurred in prior litigation with a third party -- not the defendant -- may be recoverable).   The Plaintiffs may be permitted to recover attorney fees from prior proceedings, and the other out-of-pocket expenses reasonably incurred to redress the harm resulting from Ms. Stallman's fraudulent conduct or breach of fiduciary duty (if established) are also likely compensable.

Nevertheless, even this category of damages exaggerates or overstates their claim because they did not actually incur a substantial portion of the damages included within their calculation.  For example, with respect to the court's oft-stated doubts about the Plaintiffs' claim for $322,000.00,[10] courts typically award tort damages to compensate for *out-of-pocket* expenses and losses caused by wrongful conduct, rather than for costs that a plaintiff does not actually incur.  Although the parties have not cited a case directly on

---

[9] *See* Dietel Aff. at Exh. 2, par. 5.

[10] Nearly one-third of Plaintiffs' damage claim is attributable to "[t]ime spent by Plaintiffs managing project and researching crime upon discovery of fraudulent use/conversion of funds . . ."  *See* Dietel Aff. at Exh. 2, par. 5.

point, a 1998 Michigan's Supreme Court opinion that Ms. Stallman cites strongly suggests that Michigan courts would not brook an award for "[t]ime spent by Plaintiffs managing project and researching crime upon discovery of fraudulent use/conversion of funds." *See* Dietel Aff. at Exh. 2, par. 5. Like an attorney or other *pro se* party who represents herself in litigation, the Plaintiffs did not actually incur this expense nor, according to Mr. Dietel's deposition, forego overtime or other benefits while engaged in mitigating their damages. *See McAuley v. General Motors Corp.*, 457 Mich. 513, 578 N.W.2d 282 (1998) (citing *Kay v. Ehrler*, 499 U.S. 432 (1991)); *cf.* Restatement (Third) of Torts, Liability for Economic Harm § 9 (Tentative Draft No. 2, April 7, 2014) ("A limitation to out-of-pocket recovery in most cases is probably more consistent with the approach of this Restatement, which seeks to distinguish clearly between contract and tort theories of recovery."). For the same reason the court would not award a *pro se* litigant attorney fees (assuming fees were otherwise allowable under contract or statute) the court will not award the Plaintiffs the $322,000.00 they seek for addressing the issues relating to their lake home: there is no out-of-pocket expense on this score. Throughout this second round of summary judgment briefing, and after being admonished in the First MDO, the Plaintiffs have failed to provide support for this unusual aspect of their damage claim, and the court predicts that Michigan law would exclude a recovery for costs avoided and not incurred. The court, therefore, will grant the Defendant's motion to the extent it seeks to preclude this category of damages.

Finally, the court continues to express its apprehension about awarding exemplary damages on the present record. This case seemingly involves a pecuniary grievance fully compensable with an award for any economic injury, as opposed to the "hurt feelings" or

uncertain damages for which Michigan typically allows exemplary damages. *Jackson Printing Co., Inc. v. Mitan*, 169 Mich. App. 334, 425 N.W.2d 791 (Mich. App. 1988) (*citing Hayes-Albion Corp. v. Kuberski*, 421 Mich. 170, 364 N.W.2d 609 (1984)). Nevertheless, it is at least conceivable, despite the court's present doubts, that Plaintiffs may prove the requisite injury as well as maliciousness, willfulness and wanton behavior from Ms. Stallman to subject her to such an award. Therefore, this Memorandum of Decision and Order does not foreclose such an award.

## IV. CONCLUSION AND ORDER

As the court previously noted, each party's case has one or more Achilles's Heels. The record demonstrates the Defendant's substantial involvement in the affairs of Stallman Builders, though perhaps not with respect to the Plaintiffs' particular project, and the Plaintiffs' bloated damage claim undermines the strength of their case more generally. Although the court has postponed today's ruling to give the parties space in which to settle their dispute, the parties remain deadlocked in their respective positions. At this point, a trial on the merits is the the surest path to resolution.

Therefore, the court will direct counsel to consult with chambers staff about the time, place, and duration of the trial that the court had hoped to avoid. The parties' proposed trial date shall take into account the necessity of making motions *in limine*, given the difficulties anticipated in light of Ms. Stallman's prior assertion of her Fifth Amendment rights. *See* Tr. at pp. 66, line 24 through 68, line 1 (describing difficulties expected at trial).

NOW, THEREFORE, IT IS HEREBY ORDERED that the Plaintiffs' summary judgment motion (ECF No. 77) is DENIED.

IT IS FURTHER ORDERED that the Defendant's summary judgment motion is granted to the extent it seeks to limit damages described in the Dietel Aff. at Exh. 2, par. 5 ($322,000.00) and DENIED in all other respects.

IT IS FURTHER ORDERED that the Plaintiffs' counsel shall contact the court not later than August 24, 2018, with proposed dates, locations, and times for motions *in limine, a* final pretrial conference, and trial.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Susan Jill Rice, Esq., Gregory Luyt, Esq., and Jan M. Geht, Esq.

END OF ORDER

**IT IS SO ORDERED.**

**Dated August 8, 2018**



Scott W. Dales
United States Bankruptcy Judge